IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FALCON NAVIGATION A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| ENERGY COAL SPA and ENERGY COKE SRL, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT IN ADMIRALTY

Plaintiff Falcon Navigation A/S ("Plaintiff" or "Falcon"), by and through its undersigned counsel Palmer Biezup & Henderson, LLP, files this Verified Complaint in Admiralty against Defendants Energy Coal SPA ("Energy Coal") and Energy Coke SRL ("Energy Coke") (collectively, "Defendants") and alleges, upon information and belief, as follows:

### JURISDICTION

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it arises out of a maritime contract or transaction and, therefore, falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2.      Federal jurisdiction also exists because the action arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§201, *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.*, and, therefore, falls under this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

3.      Federal jurisdiction exists over any and all other claims in that they are so related to claims in the action within the Court's original jurisdiction that they form part of the same

1

case or controversy and, thus, fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

4.      Venue is properly situated in this District because, upon information and belief, Defendants have, or will soon have, property within this District that may be attached through the process of maritime attachment and garnishment pursuant to Rule B, i.e., a cargo of petcoke being or soon to be loaded on board a vessel in the port of Wilmington, which cargo is, upon information and belief, presently within this District and being held or otherwise controlled by, on behalf of or for the benefit of Defendants.

## THE PARTIES

5.      At all times material hereto, Plaintiff Falcon was and is a foreign business entity duly organized and existing under the laws of a foreign country with an address in Denmark.

6.      At all times relevant hereto, Defendant Energy Coal was and still is a foreign business entity organized and existing under the laws of Italy with a registered office and principal place of business at Via San Vincenzo, 2 A – 16121 Genova, Italy.  Energy Coal is a wholly owned subsidiary of non-party Ice Holding Srl.  Energy Coal is the 100% parent of Energy Coke.

7.      At all times relevant hereto, Defendant Energy Coke was and still is a foreign business entity organized and existing under the laws of Italy with a registered office and principal place of business at Via San Vincenzo, 2 A – 16121 Genova, Italy.  Energy Coke is a wholly owned subsidiary of Energy Coal.

8.      At all times relevant hereto, non-party Ice Holding Srl was and still is a foreign business entity organized and existing under the laws of Italy with a registered office and

2

principal place of business at Via San Vincenzo, 2 A – 16121 Genova, Italy.  Ice Holding Srl is a 100% parent of Energy Coal which is, in turn, the 100% parent of Energy Coke.

## BACKGROUND

9.      Falcon, as owner of the M/V QUINN J, and Energy Coal, as charterer, entered into a voyage charter party on an amended Americanized Welsh Coal Charter form dated February 23, 2015 for the carriage of a cargo of petcoke from Wilmington, Delaware to one safe port / safe berth Bizerte + Porto Vesme on board the M/V QUINN J (the "Charter Party", copy attached hereto as Exhibit 1).

10.      Under the terms of the Charter Party, Energy Coal was obligated to pay demurrage at the rate of USD9,000.00 per day pro rata for time lost by the vessel at the loading and/or discharge port(s) beyond the agreed laytime period.

11.      Falcon duly delivered the vessel into the service of Energy Coal and performed all of its obligations under the Charter Party.

12.      On or about April 22, 2015, Falcon issued a Freight Recap invoice to Energy Coal, showing a demurrage balance in favor of Falcon in the amount of USD185,877.80 in accordance with the terms of the Charter Party.   (*See* Ex. 2).

13.      Despite due demand, Energy Coal refused or otherwise failed to pay any portion of the demurrage invoices due and owing to Falcon in breach of the Charter Party, and the entire amount of USD185,877.80 remains due and outstanding to date.

14.      The Charter Party provides that disputes will be resolved in arbitration in London with arbitration law and procedures prevailing in London to apply.  (*See* Ex. 1).

15.      Falcon has commenced or soon will commence arbitration against Energy Coal in London as provided for in the Charter Party.

438167.1

16.     This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Falcon's claims made or to be made in arbitration, as agreed by the parties, and Falcon reserves the right to arbitrate this matter in London.

17.     As a regular feature of English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitute a part of Falcon's main claim and the amount sued for herein.

18.     Falcon estimates, as nearly as can presently be computed, that the legal fees and costs of prosecuting their claims in London will be USD35,000.00.   Interest anticipated to be awarded is estimated to be USD23,724.85 (calculated at the rate of 5% per annum on the principal claim of USD185,877.80 and compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

19.     In all, the claim for which Falcon sues in this action, as near as presently may be estimated, totals **USD244,602.65**, no part of which has been paid by Energy Coal, despite due demand.  Falcon specifically reserves their right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure Falcon.

20.     Upon information and belief, Energy Coal has an attachable property interest in a certain cargo of petcoke that is being loaded or will soon be loaded on board a vessel in the port of Wilmington.

21.     By way of background, Energy Coal is an Italian entity that is engaged in the trading of coal and other raw materials.

22.     On or about April 13, 2015, Energy Coal submitted an application pursuant to Article 161, Comma 6, B.L., in the Court of Genoa in Italy, seeking to be admitted to a special

438167.1

procedure named "composition with creditors" as part of an apparent effort to restructure the company's debt.

23.     In connection with that application, Energy Coal formed a wholly owned subsidiary, Energy Coke, in order to transfer its petcoke business to an apparently solvent wholly owned and controlled entity through which it could continue to conduct its petcoke business with its suppliers and trading partners in the United States while it attempted to reorganize its debt in Italy.

24.     Pursuant to a Lease Agreement dated April 10, 2015 (the "Lease Agreement"), a copy of which is attached hereto as Exhibit 3, Energy Coal leased its petcoke business, including existing contracts with customers and suppliers, equipment, furniture, fittings, office machinery and IT systems along with their licenses, employee contracts, receivables from customers and office space, to Energy Coke, in exchange for an annual rental fee consisting of (1) a fixed yearly sum of Euro 480,000.00 plus (2) a variable yearly sum of between 40% and 60% of the positive EBITDA (earnings before interest, taxes, depreciation, and amortization) of Energy Coke from its carrying out and furthering Energy Coal's petcoke business.

25.     In the Lease Agreement, the parties stipulated regarding the purported basis for the Lease Agreement as follows:

> The suppliers of petcoke, for the most part large groups listed on the stock exchange, cannot – due to company policy – do business with companies undergoing insolvency procedures or similar proceedings, so the contractual relationship with Energy Coal cannot continue in its current fashion;
>
> In order to safeguard the important (and fundamental for purposes of the petcoke trading activity) business relationship with the above-mentioned suppliers by transferring it to a solvent subject, on March 25, 2015 Energy Coal established Energy Coke, in which it has a 100% shareholding, to which to rent the Company Branch [i.e. petcoke business].

438167.1

> The renting out of the Company Branch [i.e. petcoke business], contributing to ensuring the continuity of the Company and along with it, its employment levels, is consistent with the goals pursued by Energy Coal in resorting to Art. 161, paragraph 6, Financial Law (restructuring of debt as per Art. 182 Bis Financial Law, or preventative agreement for company continuity)….

Upon information and belief, and as explained more fully below, the stated basis for the Lease Agreement as purported by the parties above is merely an effort to disguise the true intention of the parties – to prevent creditors of Energy Coal, including Falcon, from obtaining security and enforcing valid claims.

26.     During the pendency of the lease agreement, Energy Coal retains both a present beneficial interest in Energy Coke's operation of the leased petcoke business as well as a future reversionary interest.  Such interests constitute property of Energy Coal that is subject to attachment pursuant to Rule B.

27.     Upon information and belief, Energy Coke is presently scheduled to load a cargo of petcoke on board a vessel now calling or soon to call at the port of Wilmington.

28.     Based upon prior business practices, Energy Coal chartered the vessel for carriage of the cargo and bills of lading were issued identifying Energy Coal as shipper.  It is expected that the present shipment will follow suit.

29.     Energy Coke and, by reason of the foregoing, Energy Coal are believed to have an attachable interest in that cargo which has been or will be loaded on board the vessel.   For these reasons, the cargo is subject to attachment pursuant to Rule B to serve as security in support of Plaintiff's claims herein.

## ALTER EGO LIABILITY

438167.1

30.    In the alternative, notwithstanding the notion of corporate separateness, by reason of the beneficial ownership and dominating control of Energy Coal over Energy Coke, Energy Coal and Energy Coke are so intertwined and indistinguishable that they operate as and are, in fact, a single business enterprise pursing a single business purpose for the ultimate benefit of Energy Coal.

31.    By way of background, and as noted above, Energy Coal is incorporated in Italy and is engaged in the trading of petcoke and other coal products internationally.

32.    Energy Coal formed Energy Coke in March 2015 specifically to enable Energy Coal to continue to carry out its petcoke business with its U.S. suppliers and trading partners through a wholly owned and controlled, and apparently solvent, entity, while Energy Coal attempts to restructure its debt in Italy.

33.    Energy Coke is, however, upon information and belief, undercapitalized. According to information obtained from the Chamber of Commerce in Italy, Energy Coke has a share capital of only EURO 10,000.  Yet, under the Lease Agreement, Energy Coke is obligated to pay to Energy Coal: (1) a fixed sum of Euro 480,000 per year; and (2) a variable yearly sum of between 40% and 60% of the positive EBITDA of Energy Coke.  (See Exhibit 4, copy of Italian Chamber of Commerce documents issued for Energy Coke; see also Exhibit 3 copy of Lease Agreement).

34.    Energy Coal and Energy Coke (as well as their ultimate parent entity, Ice Holding Srl[1]) all share the same registered office and operate out of the same principal place of business in Italy at Via San Vincenzo, 2 A – 16121 Genova.  (See Exhibit 5, printouts from website

---

[1] Energy Coal is a majority owned subsidiary of Ice Holding Srl, an entity also incorporated in Italy.  Ice Holding Srl is owned by Mr. Ascheri Agusto (holding 53.6% of the shares) and Ms. Bianchi Maria Cristina (holding 46.4% of the shares).  (See Exhibit 7, copy of Italian Chamber of Commerce document issued for Ice Holding Srl).

published by Energy Coal available online at http://www.energycoal.com/ (last viewed: June 4, 2015); see also Exhibits 4 and 6, copies of Italian Chamber of Commerce documents issued for Energy Coal and Energy Coke, respectively).

35.     Energy Coal, Energy Coke and Ice Holding Srl share identical registered email accounts at energycoal@legalmail.it, energycoke@legalmail.it and iceholding@legalmail.it.

36.     In addition to sharing common ownership, addresses and contact information, Energy Coal and Energy Coke also share overlapping management.

37.     The sole Director of Energy Coke, Mr. Paolo Ascheri, is also the CEO of Energy Coal as well as a minority shareholder in Energy Coal.  (See Exhibits 4 and 6, copies of Italian Chamber of Commerce documents issued for Energy Coal and Energy Coke, respectively).

38.     Mr. Paolo Ascheri's apparent relative, Mr. Augusto Ascheri, is the majority shareholder of the ultimate parent entity Ice Holding Srl, the sole director of that parent entity and the President of the Board of Directors of Energy Coal.  (See Exhibit 7, copy of Italian Chamber of Commerce documents issued for Ice Holding Srl).

39.     In addition, another Energy Coal affiliate named Energy Shipping S.P.A. has made multiple payments on behalf of Energy Coal under charter parties entered into between Energy Coal and third parties.  (See Exhibit 8).

40.     By virtue of and through its relationship with Energy Coke and its other affiliates, Energy Coal is pursuing, furthering and carrying out its petcoke business with its suppliers and trading partners in the United States, albeit in the name of Energy Coke, in an apparent effort to avoid efforts by creditors of Energy Coal, including Falcon, from obtaining security for their claims.

438167.1

41.     Energy Coke has no separate or independent identity from Energy Coal and exercises no independent business decision over the direction of its business and acts merely as a shell for the benefit of Energy Coal and its shareholders.

42.     Based on the foregoing, Energy Coal and Energy Coke are *alter egos* of one another in that Energy Coke is actually carrying out the business of Energy Coal as if it were its own, and all obligations, liabilities and debts of Energy Coal as a result are in fact those of Energy Coke.

43.     Energy Coal and Energy Coke should therefore be considered a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of Defendants together should be susceptible to attachment and/or restraint for the debts of Energy Coal.

## FRAUDULENT CONVEYANCE

44.     In the further alternative, as set forth in detail above, and in an attempt to evade Energy Coal's creditors, including Falcon, Energy Coal and Energy Coke have engaged in a scheme to transfer the assets and operations of Energy Coal's petcoke business to Energy Coke. More specifically, in connection with the transfer of Energy Coal's petcoke operations to Energy Coke, Energy Coal and Energy Coke jointly and severally intentionally depleted Energy Coal of its assets and transferred such assets from Energy Coal to Energy Coke.

45.     The transfers alleged herein were done with the actual intent to hinder, delay, or defraud Falcon, and other creditors of Energy Coal.

46.     In the alternative, the transfers alleged herein were made without Energy Coal having received reasonably equivalent value in exchange for such transfers and were made at a

time when Energy Coal was either insolvent or the value of the transfers far exceeded Energy Coal's remaining assets.

47.     In addition, upon information and belief, (i) the transfers were made to an entity wholly controlled by Energy Coal and an Energy Coal insider; (ii) the transfers were concealed from Falcon; (iii) the transfers were of all or substantially all of Energy Coal's assets; and (iv) the transfers occurred shortly before or after Energy Coal incurred the substantial debt to Falcon described herein.

48.     As a result of these fraudulent conveyances, Falcon seeks (i) an order authorizing the attachment of the transferred assets; (ii) an order setting aside and disgorging the transfers to the extent necessary to secure the satisfaction of Falcon's claim herein and in aid of arbitration; (iii) an injunction against Defendants preventing further disposition of the assets fraudulently transferred from Energy Coal to Energy Coke and/or the others; (iv) appointment of a receiver to take charge of the assets; and (v) any other relief the circumstances may require.

## **Request for Rule B Relief**

49.     Upon information and belief, and after investigation, Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, goods, cargo, cash, funds, escrow funds, credits, debts, accounts, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (collectively hereinafter, "ASSETS), including a cargo scheduled to be loaded on board a vessel in the port of Wilmington in the hands of certain garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

10

438167.1

50.     The total amount to be attached pursuant to the calculations set forth above is **USD244,602.65.**

WHEREFORE, Plaintiff prays:

a.      That process in due form of law according to the practice of this Court may issue against the Defendants, citing them to appear and answer the foregoing, failing which default may be taken;

b.      That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including **USD244,602.65** be restrained and attached, including, but not limited to any goods, cargo, cash, funds, escrow funds, credits, debts, accounts, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (collectively hereinafter, "ASSETS), including a cargo scheduled to be loaded on board a vessel in the port of Wilmington in the hands of certain garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.      That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling Defendant to arbitrate and/or the recognition and enforcement of any award or judgment entered against the Defendants in the London proceedings; and

d.      For such other, further and different relief as this Court may deem just and proper, including but not limited to a default with respect to any property seized in the event a timely response is not filed.

438167.1

Dated:  September 22, 2015

PALMER BIEZUP & HENDERSON LLP

By:  /s/ Michael B. McCauley
       Michael B. McCauley
       1223 Foulk Road
       Wilmington, DE 19803
       Tel.: (302) 594-0895
       Email: mccauley@pbh.com
Attorneys for Plaintiff
Falcon Navigation A/S

OF COUNSEL:

FREEHILL HOGAN & MAHAR, LLP
Michael E. Unger
Susan Lee
80 Pine Street
New York, NY  10005
Tel.: 212-425-1900
Fax: 212-425-1901
Email: unger@freehill.com
       lee@freehill.com
Attorneys for Plaintiff Falcon Navigation A/S

438167.1

## ATTORNEY VERIFICATION

Michael B. McCauley declares as follows:

1.      I am a partner in the law firm of PALMER BIEZUP & HENDERSON LLP, attorneys for Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by Plaintiff and/or by solicitors representing Plaintiff.

3.      The reason this verification is made by an attorney and not by the Plaintiff is that Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

4.      I declare under penalty of perjury that the foregoing is true and correct.

5.      Executed on September 22, 2015.


 /s/ Michael B. McCauley
Michael B. McCauley

438167.1